1  Cary Kletter
   Sally Trung Nguyen
2  KLETTER LAW FIRM
   1900 S. Norfolk Street, Suite 350
3  San Mateo, California 94403
   Telephone: 415.434.3400
4  Email: ckletter@kletterlaw.com
5
6  Attorneys for NOAH KRAVITZ

7                **UNITED STATES DISTRICT COURT**

8              **NORTHERN DISTRICT OF CALIFORNIA**

9

10 | PHONEDOG, LLC, a Delaware | ) | CASE NO. C11-03474 |

11 |            Plaintiff, | ) | **DEFENDANT'S NOTICE OF** |
                                      **MOTION AND MOTION TO**
12 | v. | ) | **DISMISS PLAINTIFF** |
              **PHONEDOG, LLC'S**
13 | NOAH KRAVITZ, an individual, | ) | **COMPLAINT FOR LACK OF** |
                                          **SUBJECT MATTER**
14 |            Defendants. | ) | **JURISDICTION UNDER FED. R.** |
15 | | ) | **CIV. PROC. RULE 12(b)(1)AND** |
         **FOR FAILURE TO STATE A**
16 | | ) | **CLAIM UNDER FED. R. CIV.** |
         **PROC. RULE 12(b)(6);**
17 | | ) | **MEMORANDUM OF POINTS** |
         **AND AUTHORITIES IN**
18 | | ) | **SUPPORT THEREOF** |
19 | | ) | |
20 | | ) | **Date:** September 15, 2011 |
             **Time:** 10:00 a.m.
21 | | ) | **Dept.:** Courtroom B – 15th Floor |
             **Judge:** Maria-Elena James
22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

NOTICE OF MOTION AND MOTION ....................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

I.    INTRODUCTION............................................................................................ 1

II.   PENDING CALIFORNIA ACTION .............................................................. 2

III.  STATEMENT OF ISSUES............................................................................. 4

IV.   PHONEDOG'S ALLEGATIONS ................................................................... 4

V.    ARGUMENT ................................................................................................... 6

    A.    Plaintiff PhoneDog's Complaint Must Be Dismissed Because PhoneDog Cannot Satisfy the Jurisdictional Limit for Diversity of Citizenship.................. 6

        1.    Legal Standard for Motion to Dismiss For Lack of Subject Matter Jurisdiction Under FRCP 12(b)(1) ............................................... 7

        2.    The Court Lacks Jurisdiction Over This Action Because PhoneDog Cannot Establish $75,000 in Damages by Competent Proof.................. 8

            a.    PhoneDog Is Not Entitled to Any Damages Because It Does Not Own or Have a Right to Possess the Account....................... 9

            b.    The Account In Itself Has No Monetary Value ......................... 10

            c.    Even If, *Arguendo*, Twitter Accounts Have Monetary Values, Any Monetary Value for the Account Would Not Exceed $75,000...................................................................................... 11

    B.    Plaintiff PhoneDog's Complaint Must Be Dismissed For Failure to State a Claim .............................................................................................................. 13

        1.    Legal Standard for Motion to Dismiss For Failure to State Claim Under FRCP 12(b)(6)......................................................................................... 13

        2.    PhoneDog's First Claim For Relief – Misappropriation of Trade Secrets ........................................................................................ 14

        3.    PhoneDog's Second Claim For Relief – Intentional Interference With Prospective Economic Advantage........................................................... 17

        4.    PhoneDog's Third Claim For Relief – Negligent Interference With Prospective Economic Advantage........................................................... 18

        5.    PhoneDog's Fourth Claim For Relief – Conversion............................... 19

VI.   CONCLUSION .............................................................................................. 20

1

## TABLE OF AUTHORITIES

2 | **FEDERAL CASES**

3 | *Ashcroft v. Iqbal*
129 S. Ct. 1937 (2009) ..................................................................................... 7, 13

4

*Balistreri v. Pacifica Police Dept.*
5 | 901 F.2d 696 (9th Cir. 1990).............................................................................. 13

6 | *Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007) .................................................................................. 7, 13, 14

7

*Bellock v. Orkin Exterminating Co., Inc.*
8 | 754 F.Supp.122 (N.D. Ill. 1990) ....................................................................... 7, 8

9 | *Cahill v. Liberty Mut. Ins. Co.*
80 F.3d 336 (9th Cir. 1996)................................................................................ 13

10

*Commodity Trend Service, Inc. v. Commodity Futures Trading Comm'n*
11 | 149 F.3d 679 (7th Cir. 1998)............................................................................ 7-8

12 | *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*
911 F.2d 242, 247 (9th Cir. 1990)...................................................................... 14

13

*Diefenthal v. C.A.B.*
14 | 681 F.2d 1039 (5th Cir. 1982)............................................................................. 6

15 | *Gaus v. Miles, Inc.*
980 F.2d 564 (9th Cir. 1992)................................................................................ 7

16

*Gibbs v. Buck*
17 | 307 U.S. 66 (1939) ............................................................................................. 8

18 | *Gould Electronics Inc. v. United Statesi*
220 F.3d 169 (3rd Cir. 2000)............................................................................... 8

19

*Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*
20 | 570 F.3d 811 (7th Cir. 2009).............................................................................. 13

21 | *Jacobson v. AEG Capital Corp.*
50 F.3d 1493 (9th Cir. 1995).............................................................................. 13

22 | *Johnson v. Wattenbarger*
23 | 361 F.3d 991 (7th Cir. 2004)................................................................................ 6

24 | *Matheson v. Progressive Specialty Ins. Co.*
319 F.3d 1089 (9th Cir. 2003).............................................................................. 8

25 | *McNutt v. General Motors Acceptance Corp.*
26 | 298 U.S. 178 (1936) ........................................................................................... 7

27 | *Neubronner v. Milken*
6 F.3d 666 (9th Cir. 1993).................................................................................. 16

28

1   *NLFC, Inc. v. Devcom Mid-America, Inc.*
    45 F.3d 231 (7th Cir. 1995)................................................................8
2
    *Pareto v. F.D.I.C.*
3   139 F.3d 696 (9th Cir. 1998).......................................................14, 18

4   *Rapoport v. Rapoport*
    416 F.2d 41 (9th Cir. 1969)................................................................8
5
    *Rexford Rand. Corp. v. Ancel*
6   58 F.3d 1215 (7th Cir. 1995)..............................................................8

7   *Roberts v. Corrothers*
    812 F.2d 1173 (9th Cir. 1987)............................................................8
8
    *Sanchez v. Monumental Acceptance Corp.*
9   102 F. 3d 298 (9th Cir. 1995)............................................................7

10  *Sprewell v. Golden Gate Warriors*
    266 F.3d 979 (9th Cir. 2001)............................................................14
11
    *St. Paul Mercury Indemnity Co. v. Red Cab Co.*
12  303 U.S. 283 (1938)........................................................................8

13  *Valdez v. Allstate Ins. Co.*
    372 F.3d 1115 (9th Cir. 2004)............................................................7
14
    *Velasco v. Government of Indonesia*
15  370 F.3d 392 (4th Cir. 2004)..............................................................8

16  *Williamson v. Tucker*
    645 F.2d 404 (7th Cir. 1987)............................................................7
17
    **FEDERAL STATUTES**
18
    28 U.S.C. § 1332 ...................................................................2, 6, 20
19
    Fed. R. Civ. P. 9(b)..........................................................................16
20
    Fed. R. Civ. P. 12(b)(1).............................................................*passim*
21
    Fed. R. Civ. P. 12(b)(6).............................................................*passim*
22
    **STATE CASES**
23
    *Blank v. Kirwan*
24  39 Cal.3d 311 (1985)......................................................................17

25  *Burlesci v. Petersen*
    68 Cal.App.4th 1062 (1998)..............................................................19
26
    *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*
27  11 Cal.4th 376 (1995)....................................................................18

28  *Diodes, Inc. v. Franzen*
    260 Cal.App.2d 253 (1968)..............................................................14

– iii –

*Farrington v. A. Teichert & Son, Inc.*
59 Cal.App.2d 468 (1943)................................................................................... 20

*Janda v. Madera Cmty. Hosp.*
16 F. Supp.2d 1181 (E.D. Cal. 1998).................................................................. 17

*Korea Supply Co. v. Lockheed Martin Corp.*
29 Cal.4th 1134 (2003)....................................................................................... 17

*LiMandri v. Judkins*
52 Cal.App.4th 326, 348 (1997).......................................................................... 19

*Moore v. Regents of the University of California*
51 Cal.3d 120 (1990)........................................................................................... 19

*Morlife, Inc. v. Perry*
56 Cal.App.4th 1514 (1997)................................................................................ 15

*North American Chemical Co. v. Sup. Court*
59 Cal.App.4th 764 (1997).................................................................................. 18

*Roth v. Rhodes*
25 Cal.App.4th 530 (1994)................................................................................... 17

*Taylor v. Forte Hotels International*
235 Cal.App.3d 1119 (1991)............................................................................... 19

*Whyte v. Schlage Lock Co.*
101 Cal.App.4th 1443 (2002).............................................................................. 18

*Youst v. Longo*
43 Cal.3d 64 (1987)............................................................................................. 17

**STATE STATUTES**

California Uniform Trade Secret Act

Cal. Civ. Code §§3426, et seq............................................................................. 14, 16

**NOTICE OF MOTION AND MOTION**

TO PLAINTIFF PHONEDOG, LLC AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on September 15, 2011 at 10:00 a.m., or soon thereafter as the motion may be heard, in Courtroom B – 15th Floor of the above-referenced Court, located at 450 Golden Gate Avenue, San Francisco, California, before Honorable Maria-Elena James, Defendant Noah Kravitz ("Kravitz"), by and through undersigned counsel, will move this Court to dismiss Plaintiff PhoneDog, LLC's ("PhoneDog") Complaint pursuant to Fed.R.Civ.Proc. ("FRCP") 12(b)(1) for lack of subject matter jurisdiction and pursuant to FRCP 12(b)(6) for failure to state a claim upon which relief can be granted.

By this motion, Defendant seeks an order from this Court dismissing the case with prejudice.  This Motion is made and based upon this Notice and Motion to Dismiss, the accompanying Memorandum of Points and Authorities, the Declaration of Noah Kravitz, the Declaration of Cary Kletter and upon all the pleadings, records, and papers on file herein, and upon any further and additional evidence that may be presented to or at the time of the hearing on this Motion.

Dated: August 4, 2011                        KLETTER LAW FIRM

By:_____
Cary Kletter
Attorney for Plaintiff
NOAH KRAVITZ

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.      **INTRODUCTION**

This case should be dismissed for several reasons:  1) There is no diversity because the amount in controversy is less than $75,000 [FRCP 12(b)(1)]; 2) Plaintiff is improperly forum shopping, since Defendant Kravitz previously filed suit against PhoneDog in the Superior Court of the State of California in Alameda County; and 3) No viable claim has been alleged

because a Twitter account's followers are not "secret", a Twitter account and its humans followers are not property, the password to the Twitter account is not a "trade secret" because Kravitz created the password and Kravitz did not take any property of PhoneDog's.

Kravitz worked for PhoneDog for more than 5 years creating content for its online website PhoneDog.com, initially being paid for each article written individually, then later a monthly fee for all articles written and video blogs created and later still a percentage of company revenue and profits. A dispute arose between Kravitz and PhoneDog in 2010, and in October 2010 Kravitz left the company. At that time, PhoneDog owed Kravitz substantial unpaid wages and profits and Kravitz attempted to resolve the dispute informally. When those efforts failed, Kravitz filed suit in the California Superior Court in Alameda County (the "Superior Court Action") on June 8, 2011. (See Declaration of Cary Kletter ("Kletter Decl.") ¶ 5.)

## II.    PENDING CALIFORNIA ACTION

Prior to the filing of the Superior Court Action, Kravitz and his counsel made multiple attempts to resolve the matter informally with PhoneDog and provided it with a copy of the complaint he planned to file. At no time prior to the filing of this lawsuit did PhoneDog raise any of the issues it now alleges in its Complaint filed on July 15, 2011. All of PhoneDog's allegations are based upon Kravitz's use of a Twitter account Kravitz single-handedly created (the "Account"). The Complaint contains four claims for relief, all based upon California law. PhoneDog never expressed any disapproval of Kravitz's use of the Account at issue, and in fact repeatedly asked him to send out tweets on its behalf after he left employment with PhoneDog in October 2010. PhoneDog only now raises the meritless and unsupported issues in this suit for the first time as an attempt to prevent the Superior Court Action from proceeding. PhoneDog's conduct constitutes improper forum shopping.

PhoneDog asserts that this Court has subject matter jurisdiction under 28 U.S.C. § 1332 on the grounds of diversity jurisdiction. (Complaint ("Compl.") ¶ 3.) However, as outlined below, PhoneDog cannot establish an amount in controversy over $75,000 through competent

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

proof of damages as required by law. PhoneDog's exaggerated and unrealistic claims about the amount in controversy are a patent and disingenuous attempt to create diversity. PhoneDog cannot prove the amount in controversy in this case exceeds $10,000. Selling a Twitter account is not permitted pursuant to Twitter's Terms of Service, so the Account cannot be sold. PhoneDog cannot demonstrate with competent evidence that there is an industry standard in determining the worth of a Twitter account based solely on the amount of followers. The "value of a Twitter account" is dependent on a number of factors including, but not limited to, the number of tweets, the person tweeting, the content of the tweets and the number of followers. Based on these factors, the potential "value", if any, of the Account is no more than $8,000 according to multiple online Twitter value calculators. Because the amount at issue is not in excess of $75,000, this Court lacks subject matter jurisdiction and the Complaint should be dismissed.

In addition, because PhoneDog's Complaint fails to state a claim upon which relief can be granted, this action should be dismissed. PhoneDog's factual allegations are insufficient to raise a right to relief above a speculative level. PhoneDog has not sufficiently alleged that the identity of followers or "password" to the Account fall under the definition of "trade secret" or that Kravitz engaged in any act of misappropriation. Additionally, PhoneDog insufficiently alleges a special economic relationship ever existed between PhoneDog and the followers of the Account maintained exclusively by Kravitz that would "probably" result in an economic benefit to PhoneDog, nor is there any evidence of an actual disruption of that relationship. Moreover, neither the Account nor any of its followers are properties of PhoneDog. The Account itself is the exclusive property of Twitter, not PhoneDog. The Account's followers, on the other hand, are humans and since the passage of the Thirteenth Amendment to the United States Constitution in 1985, humans in the United States are not "property" and cannot be owned.

1   Kravitz therefore brings this Motion to Dismiss Plaintiff PhoneDog's Complaint for

2   Lack of Subject Matter Jurisdiction Under Fed.R.Civ.Proc. Rule 12(b)(1) and for Failure to

3   State a Claim Under Fed.R.Civ.Proc. Rule 12(b)(6).

4   **III.    STATEMENT OF ISSUES**

5   The issues to be decided in this Motion are as follows:

6   1)  whether the amount in controversy does not exceed $75,000 depriving this Court of

7   subject matter jurisdiction; and

8   2)  whether the Complaint failed to state a claim upon which relief can be granted.

9   **IV.    PHONEDOG'S ALLEGATIONS[1]**

10  PhoneDog is a Delaware Corporation with its principal place of business in Mount

11  Pleasant, South Carolina. (Compl. ¶ 1.)  PhoneDog engages in the business of providing

12  reviews of the latest mobile products and services and providing users the resources needed to

13  research, compare prices and shop from those providers that fit their needs.  (Compl. ¶ 8.)

14  PhoneDog alleges that it employed Kravitz as a product reviewer and video blogger beginning

15  on or around April 13, 2006.  (Compl. ¶ 14.)  PhoneDog alleges that as part of Kravitz's

16  employment, Kravitz submitted written and video content to PhoneDog, which was then

17  transmitted to its users via a variety of mediums including but not limited to, PhoneDog's

18  website and PhoneDog's @PhoneDog_Noah Twitter account. (Compl. ¶ 14.)

19  PhoneDog alleges that Kravitz maintained the Twitter account "@PhoneDog_Noah"

20  (the "Account"). (Compl. ¶ 15.)  PhoneDog does not allege that there was any agreement with

21  Kravitz regarding the Account should the employment relationship cease.  PhoneDog alleges

22  Kravitz accessed the Account using PhoneDog's Confidential Information, used the Account to

23  disseminate information and promote PhoneDog's services on behalf of PhoneDog (Compl. ¶

24  15.) and that the Confidential Information includes the passwords to PhoneDog's Twitter

25

26

27  [1]  All factual statement herein are as alleged in Plaintiff's Complaint.  Defendant does not admit, concede, or otherwise accept any of the allegations as true, but rather presents these facts as set forth in Plaintiff's Complaint.  As set forth in the Argument section below, the Court is not bound to accept all of the allegations as true since Kravitz challenges subject matter jurisdiction and alleges failure to state a claim.

28

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. C11-03474
- 4 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

accounts, including all @PhoneDog_NAME Twitter accounts used by PhoneDog's employees. (Compl. ¶ 12.)  Nowhere in PhoneDog's Complaint does it allege that the password to the Account has any independent economic value.

PhoneDog alleges that the Account generated approximately 17,000 Twitter followers during the course of Kravitz's employment.   (Compl. ¶ 16.)   Nowhere in PhoneDog's Complaint does it allege that there was any economic relationship with any of the Account's followers that did or probably would have resulted in an economic benefit to PhoneDog. Further, PhoneDog's Complaint does not allege that there was any actual disruption of any such relationship.

PhoneDog alleges that according to industry standards, each Twitter *follower* is currently valued at $2.50 per month. (Compl. ¶ 16.) However, PhoneDog does not allege that there is any industry standard in determining the value of a Twitter account.   Further, PhoneDog does not allege that the Account generates any direct profits, nor does it allege that it was entitled to any profit directly resulting from the Account.

PhoneDog alleges that Kravitz suddenly resigned from PhoneDog in October 2010. (Compl. ¶ 17.)  PhoneDog alleges that following Kravitz's resignation, PhoneDog requested that Defendant relinquish use of the Account.  (Compl. ¶ 17.)  PhoneDog also alleges that instead of relinquishing use of the Account, Kravitz changed the Twitter handle to the Account to "@noahkravitz" and continues to use the Account under the handle "@noahkravitz". (Compl. ¶ 17.)  PhoneDog does not allege that there was any agreement prohibiting Kravitz from changing the Twitter handle to the Account to "@noahkravitz" without PhoneDog's permission.  Also, PhoneDog does not allege that Kravitz was prohibited from communicating with any of the Account's followers, which were widely known and publicly displayed on the Account's homepage.

PhoneDog alleges that subsequent to resigning from his employment with PhoneDog, Kravitz used PhoneDog's Confidential Information to access the Account.  (Compl. ¶ 19.) Nowhere in PhoneDog's Complaint does it allege that Kravitz acquired the password to the

Account by theft, bribery, misrepresentation, breach or breach of duty to maintain secrecy, or espionage through electronic or other means. PhoneDog does not allege any facts as to the times, dates, place or benefits received in the alleged use of Confidential Information, other than (presumably) use of the Account.

PhoneDog alleges that Kravitz has and is attempting to discredit PhoneDog and destroy the confidence that PhoneDog's users have in PhoneDog by and through his use of the Account, disparaging PhoneDog. (Compl. ¶ 20.) Nowhere in PhoneDog's Complaint does it allege that Kravitz made any disparaging statements about PhoneDog. There are no allegations of libel or slander.

PhoneDog's Complaint includes four (4) claims for relief: (1) Misappropriation of Trade Secrets; (2) Intentional Interference with Prospective Economic Advantage; (3) Negligent Interference with Prospective Economic Advantage; and (4) Conversion. PhoneDog asserts jurisdiction based upon diversity of citizenship and amount in controversy. (Compl. ¶¶ 21-43.) All of these claims fail as a matter of law.

## V. ARGUMENT

### A. Plaintiff PhoneDog's Complaint Must Be Dismissed Because PhoneDog Cannot Satisfy the Jurisdictional Limit for Diversity of Citizenship

Federal diversity jurisdiction exists only in "civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between – (1) citizens of different States..." 28 U.S.C. § 1332(a). Diversity jurisdiction must be ascertained at the commencement of the action and therefore diversity jurisdiction exists if the complaint as filed puts more than $75,000 at issue. *Johnson v. Wattenbarger*, 361 F.3d 991, 993 (7th Cir. 2004). Here, the amount in controversy does not meet the jurisdictional threshold and the Complaint must be dismissed.

Further, Courts may dismiss an action where the amount in controversy alleged is in "bad faith" because it was falsely asserted solely to invoke federal diversity jurisdiction. *See Diefenthal v. C.A.B.*, 681 F.2d 1039, 1052 (5th Cir. 1982). "While a federal court must of

course give due credit to the good faith claims of the plaintiff, a court will be remiss in its obligations if it accepted every claim of damages at face value, no matter how trivial the underlying injury. *Id.* Parties invoking federal diversity jurisdiction must show the basis for the amount of damages they claim before allowing the expense and burden of full trial on the merits. *Id.* at 1053. Here, despite no plausible basis that the amount in controversy exceeds $75,000 (or even $10,000), PhoneDog makes that assertion solely to invoke federal jurisdiction in an attempt to improperly remove Kravitz's Superior Court Action.

### 1. Legal Standard for Motion to Dismiss For Lack of Subject Matter Jurisdiction Under FRCP 12(b)(1)

A party may seek dismissal of an action for lack of subject matter jurisdiction by motion. Fed.R.Civ.Proc. Rule 12(b)(1). The complaint must contain sufficient jurisdictional facts to state a claim which is plausible on its face and raises a right of relief above the speculative level. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). The party asserting federal jurisdiction must provide evidence that it is "more likely than not" that the amount in controversy exceeds $75,000. *Sanchez v. Monumental Acceptance Corp.*, 102 F. 3d 298, 403-04 (9th Cir. 1995); *see also McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936) ("[J]urisdiction may [not] be maintained by mere averment[.]"); *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1117 (9th Cir. 2004); *Gaus v. Miles, Inc.*, 980 F.2d 564 (9th Cir. 1992) (holding that a conclusory allegation does not satisfy the burden of setting forth the underlying facts supporting the assertion that the amount in controversy exceeds $75,000).

When the court's jurisdiction is challenged as a matter of fact ("factual attack"), the court is not bound to accept the allegations of plaintiff's complaint. *See Bellock v. Orkin Exterminating Co., Inc.*, 754 F.Supp.122, 123 (N.D. Ill. 1990); *Williamson v. Tucker*, 645 F.2d 404 (7th Cir. 1987). "The presumption of correctness that we accord to a complaint's allegations falls away on the jurisdictional issue once a defendant proffers evidence that calls the court's jurisdiction into question." *Commodity Trend Service, Inc. v. Commodity Futures*

1    *Trading Comm'n*, 149 F.3d 679, 685 (7th Cir. 1998).   Factual attacks are based on *extrinsic*

2    *evidence* quite apart from the pleading.   *See Gould Electronics Inc. v. United Statesi*, 220 F.3d

3    169 (3rd Cir. 2000).   Since the court's power to hear the case is at stake, the court is not limited

4    to considering the allegations of the complaint.   *Roberts v. Corrothers*, 812 F.2d 1173, 1177

5    (9th Cir. 1987).   The court may consider extrinsic evidence and ultimately determine the facts

6    for itself.   *Id; See also Velasco v. Government of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004)

7    (court may consider evidence outside pleadings).

8            When a factual attack is made on the amount of controversy, the plaintiff bears the

9    burden to support its assertion with competent proof.   *See Rexford Rand. Corp. v. Ancel*, 58

10   F.3d 1215, 1218 (7th Cir. 1995); *Bellock*, 754 F. Supp. at 12; *Gibbs v. Buck*, 307 U.S. 66, 72

11   (1939) (plaintiff has the burden of showing that "it does not appear to a legal certainty that his

12   claim is for less than the jurisdictional limit"); *St. Paul Mercury Indemnity Co. v. Red Cab Co.*,

13   303 U.S. 283, 287 no. 10 (1938) (the party invoking the court's jurisdiction bears the burden of

14   supporting the allegation if challenged; *Rapoport v. Rapoport*, 416 F.2d 41, 44 (9th Cir. 1969)

15   (plaintiff's burden to prove jurisdiction upon challenge); *Matheson v. Progressive Specialty*

16   *Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003) (the party asserting federal jurisdiction must

17   "prove, by a preponderance of the evidence the amount in controversy meets the jurisdictional

18   threshold).   Competent proof means "proof of a reasonable probability that jurisdiction exists."

19   *Ancel*, 58 F.3d at 1218 (citing *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 237 (7th

20   Cir. 1995)).

21

22              **2.      The Court Lacks Jurisdiction Over This Action Because PhoneDog**
                          **Cannot Establish $75,000 in Damages by Competent Proof**

23           The burden is on PhoneDog to establish jurisdiction in this Court.   *See Ancel*, 58 F.3d at

24   1218; *Bellock*, 754 F.Supp. at 123.   PhoneDog therefore must come forward with competent

25   proof that it suffered damages in excess of $75,000 as result of Kravitz's continued use of the

26   Account.   If PhoneDog cannot produce any such proof or if the proof demonstrates that its

27

28

purported damages are far less than $75,000, as alleged by Kravitz, the Court must dismiss the Complaint because subject matter jurisdiction does not exist.

**a.**    **PhoneDog Is Not Entitled to Any Damages Because It Does Not Own or Have a Right to Possess the Account**

PhoneDog cannot establish damages exceeding $75,000 by competent proof. The alleged damages upon which PhoneDog relies to meet the jurisdictional threshold purportedly result from Kravitz's continued use of the Account, which it claims are $340,000 (i.e. based on 17,000 twitter followers, each worth $2.50 per month, for 8 months). (Compl. ¶ 41). However, PhoneDog cannot establish that it is entitled to any monetary recovery because it does not have competent proof that it has ownership or right to possession over the Account or the followers. In fact, the Account, as all Twitter accounts are, is the exclusive property of Twitter and its licensors, not PhoneDog. Pursuant to Twitter's Terms of Service ("TOS"), "[a]ll right, title, and interest in and to the Service (excluding Content provided by users) are and will remain the exclusive property of Twitter and its licensors." (Kletter Decl. ¶ 5.) Twitter also has the exclusive right to "terminate users or reclaim usernames." (Kletter Decl. ¶ 5.) Moreover, Twitter users are strictly prohibited from making a monetary profit off their accounts without the specific permission from Twitter to do so. (Kletter Decl. ¶¶ 5-6.) PhoneDog has not alleged that it has permission from Twitter to do so. Similarly, PhoneDog does not own any of the followers. "Followers" are human beings who have the discretion to subscribe and/or unsubscribe to the Account without the consent of PhoneDog. It is also well-established in the U.S. that human beings are not property and cannot be owned. As such, PhoneDog's assertion that it is entitled to a substantial amount of damages because it is the owner of the Account and the "owner" of the "followers" is wholly misplaced. It is impossible for Kravitz to have converted PhoneDog's property where these human beings implicitly cannot be owned by PhoneDog.

It should also be noted that even if Twitter users can "own" their accounts, there is no authority that PhoneDog can present to show that it owns or has the right to possess the account. The question of whether an employer or employee "owns" a Twitter account is a new

1    and emerging area. There is currently no case law on the issue. However, industry precendent

2    establishes that absent specific agreement to the contrary, an employer does not own any

3    employees' Twitter account. For example, when Laura Kuenssberg separated from her

4    employment with British Broadcasting Corporation's ("BBC") as the Chief Political

5    Correspondent recently, she retain her Twitter account with over 60,000 followers despite

6    commencing work for a rival media outlet ITV. BBC could not prevent Ms. Kuenssberg from

7    changing the handle of the Twitter account from "@BBCLauraK" to "@ITVLauraK".

8    Similarly, after Rick Sanchez was terminated from his employment with CNN, he also retained

9    and continued to use his Twitter account (formerly "@ricksanchezcnn") with over 146,000

10   followers. To date, the industry precedent has been that absent an agreement prohibiting any

11   employee from doing so, after an employee leaves an employer, they are free to charge their

12   Twitter handle.

13

14        b.    **The Account In Itself Has No Monetary Value**

15        Regardless of whether PhoneDog owns the Account, it cannot establish at least $75,000

16   in damages. In fact, there is no evidence that a Twitter account in itself has any monetary

17   value at all. PhoneDog neither states that there is an actual recognized method to measure the

18
19   value of a Twitter "account", nor does it allege that its method of calculating the value of the

20   Account is in accordance with an "industry standard." PhoneDog also does not state how

21   ProneDog profits off the Account or how an account can have any real value, especially when

22   users are strictly prohibited from selling it or using for business purposes not specifically

23   authorized by Twitter.

24
25        Additionally, any value objectively assigned to a Twitter account has no relevancy

26   because the value of a Twitter account can only realistically be based on what someone would

27   actually pay, and as discussed above, selling or purchasing a Twitter account is strictly

28   prohibited by the TOS. Moreover, a Twitter account has "followers" because of the *person*

behind the account. That is why the Twitter accounts with the most followers are those used and maintained by celebrities. If the account is sold or transferred to another person, the account itself would not retain the value. For example, back in 2007, a Twitter user started a Twitter account named @cnnbrk in which the user published breaking CNN world news. That account user had no association with CNN and eventually gained over 900,000 followers. Ultimately, CNN hired the Twitter user of @cnnbrk as a consultant; CNN did not and could not buy the account itself. Thus, it was the Twitter user is time and employment that was worth monetary value, not the actual Twitter account, itself.

Here, Kravitz was the sole *person* who utilized and maintained the Account and built up the fan-base. (Kravitz Decl. ¶ 4.) The 17,000 followers of the Account, as alleged in PhoneDog's Complaint, were following Kravitz. These followers also had the discretion to unsubscribe to the Account when Kravitz left the employ of PhoneDog and changed the name of the handle of the Account to @noahkravitz to make it clear to the followers that he was no longer associated with PhoneDog. (Kravitz Decl. ¶ 9.) As such, those who continued to follow the Account are in essence following Kravitz (i.e. the *person* behind the Account), not the Account in itself. Forcing Kravitz to surrender his Twitter Account would be analogous to forcing him to surrender all of his contacts on his mobile phone.

> c.  **Even If, *Arguendo*, Twitter Accounts Have Monetary Values, Any Monetary Value for the Account Would Not Exceed $75,000**

PhoneDog alleges that each Twitter "follower" is currently valued at $2.50 per month according to "industry standard." (Compl. ¶ 16.) Based on this vague and unsupported allegation, PhoneDog concludes that the Account is worth $42,500 per month. (Compl. ¶16.) However, PhoneDog cannot present any valid evidence of such an "industry standard" measuring the value of a Twitter "follower". Even if such an industry standard exists,

PhoneDog does not state and cannot prove that the value of a "follower" alone directly correlates with the value of a Twitter "account". At the very least, any actual accurate measure of a Twitter account's value would require metric and analytics provided by Twitter and social media software. There is no single determinative factor in measuring the value of a social media account. Rather, the value is most likely based on multiple factors, including but not limited to: (1) the number of followers; (2) the number of tweets; (3) the content of the tweets; (4) the person publishing the tweets; and (5) the person placing the value of the account.

Adopting PhoneDog's calculation to determine the value of a Twitter account would only lead to absurd and unrealistic values. For example, musician/artist Lady Gaga's Twitter account has the highest number of followers (i.e. over 12,000,000 followers). Applying PhoneDog's calculation would mean that Lady Gaga's Twitter account is "worth" $30 million per month (i.e. 12 million followers, each worth $2.50/month) and therefore $3.6 billion per year. Similarly, any ordinary person's Twitter account could potentially be worth over $1 million given enough time, despite the identity of the person tweeting or the content of the materials published on the Twitter account.

Additionally, this value regarding Lady Gaga's account contradicts what many specialized and recognized online Twitter account value calculations[2] have concluded as the worth of Lady Gaga's Twitter account. For example, according to "Tweetvalue.com", the value of Lady Gaga's account with over 12 million followers is only $118,747 while the value of Kravitz with currently 20,519 followers is only $4,380. Moreover, according to "whatsmytwitteraccountworth.com", Lady Gaga's Twitter account is valued at $6,078,041 while the value of Kravitz's account is only $7,705. These figures do not come anywhere close to PhoneDog's asserted valuation pursuant to its calculation method. PhoneDog has clearly chosen this valuation method solely to reach the jurisdictional threshold.

---

[2] It should be noted that the online Twitter account value calculations are only applications evaluating virtual values without provided any real value. In reality, these calculations have no worth unless someone actually wants to purchase a Twitter account for the amount calculated by these applications.

1

2

### B.   Plaintiff PhoneDog's Complaint Must Be Dismissed For Failure to State a Claim

3

4

A party may move for an order dismissing a complaint for failure to state a cause of action for which relief can be granted.  FRCP 12(b)(6); *see also Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811 (7th Cir. 2009) ( "A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted").  While a complaint need not contain detailed factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A complaint must allege "enough facts to state a claim to relief that is plausible on its fact." *Id.* at 556-57.  In other words, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).

5

6

7

8

9

10

11

12

13

### 1.   Legal Standard for Motion to Dismiss For Failure to State Claim Under FRCP 12(b)(6)

14

15

When resolving a Rule 12(b)(6) motion, a court must:  (1) construe the complaint in light most favorable to the plaintiff; (2) accept all well-pleaded factual allegations as true; and (3) determine whether the plaintiff can prove any set of facts to support a claim that would merit relief. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).  A dismissal under Rule 12(b)(6) is proper where there is either a "lack of cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990).  Moreover, a motion to dismiss may be construed as a motion for summary judgment whenever matters outside the pleadings are presented to and accepted by the court. *Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1496 (9th Cir. 1995) (citations omitted).

16

17

18

19

20

21

22

23

24

25

Before the court decides whether the factual allegations, if assumed true, allege a "plausible" claim, it must first identify which statements in the complaint are factual allegations and which are legal conclusions. *Iqbal*, 129 S. Ct. at 1951.  Conclusory allegations may be disregarded by the courts.  The court is not bound to accept as true allegations that are

26

27

28

legal conclusions, even if cast in form of factual allegations. *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). Conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss. *Id.* The court need not accept as true allegations that are conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden Gate Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *see also Twombly*, 550 U.S. at 561 ("a wholly conclusory statement of [a] claim" will not survive a motion to dismiss). Additionally, a court need not permit an attempt to amend a complaint if "it determines that the pleading could not possibly be cured by the allegations of other facts. *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

### 2.   PhoneDog's First Claim For Relief – Misappropriation of Trade Secrets

PhoneDog's claim of misappropriation of trade secrets must be dismissed because the identity of the Account followers and the "password" to the Account which PhoneDog alleges were misappropriated by Kravitz are not a "trade secret" within the meaning of the California Uniform Trade Secrets Act ("UTSA"). The UTSA defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, technique, or process that: (1) derives <u>independent economic value,</u> actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain secrecy." Civ. Code §3426 (emphasis added). A complaint for the misappropriation of trade secrets "should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least where the secret lies." *Diodes, Inc. v. Franzen*, 260 Cal.App.2d 253 (1968).

The followers of the Account are not secret because they are and have been publically available for all to see at all times. All Twitter followers are all visible on each Twitter site. PhoneDog also alleges that the "trade secret" information at issue is "the passwords to

PhoneDog's Twitter accounts, including all @PhoneDog_NAME Twitter accounts used by PhoneDog's employees (collectively, the "Confidential Information")."   (Compl. ¶ 12.) However, passwords to Twitter accounts do not derive any actual or potential independent economic value under the UTSA.  For confidential information to have "independent economic value" to qualify as a "trade secret", the secrecy of the information must provide a "substantial business advantage".  *Morlife, Inc. v. Perry*, 56 Cal.App.4th 1514, 1522 (1997) (a confidential list of customers has such value because its disclosure would allow a competitor to solicit more effectively and selectively); *see also Whyte v. Schlage Lock Co.*, 101 Cal.App.4th 1443, 1456 (2002) (information related to cost and pricing, marketing strategy and manufacturing technology can be trade secrets).  Here, the secrecy of the password to the Account does not provide any substantial business advantage.  There is no confidential information an individual can obtain that may lead to some economic value by using the password to access the Account. Unlike a password to a company's computer network or server, logging into a Twitter account allows one to view only information already widely known (e.g. list of followers that is already displayed on the account's homepage and thereby easily assessable to competitors and the tweets which are available to everyone at times).  Disclosure or use of the Twitter passwords would not result in any economic gain, especially since it does not provide an individual with access to any valuable, special, secret or confidential trade information.

It should be noted that PhoneDog did not create the password to the Account.  Kravitz initially created the Account, including creating the Account's password.  (Kravitz Decl. ¶ 4.) Contrary to PhoneDog's assertion, the password to the Account therefore does not reflect any secret information of PhoneDog, and Kravitz did not use any PhoneDog's "confidential information" to access the account.  (Compl. ¶ 15.)

Additionally, PhoneDog did not make any reasonable efforts to maintain the secrecy of the password to the Account which it now claims to be a trade secret.  Specifically, there is no written agreement with respect to the proprietary or confidentiality of the Twitter passwords. For example, PhoneDog did not require its employees to sign any non-disclosure or

confidential agreement with respect to the Twitter accounts and passwords to maintain secrecy. As such, the identity of the followers and the passwords to the Account do not fall under the definition of "trade secrets".

Furthermore, PhoneDog did not allege any act of Kravitz that falls within the definition of "misappropriation". Here, misappropriation under the UTSA would require the "[d]isclosure or use of a trade secret of another without express or implied consent by a person who...[u]sed improper means to acquire knowledge of the trade secret..." Civ. Code § 3426.1(b). Pursuant to California Civil Code §3426.1(a), acquisition of a trade secret by "[i]mproper means includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." However, PhoneDog only makes the conclusory allegation that Kravitz used "improper means, as such are defined in Civil Code § 3426.1(a), to obtain and misappropriate the Confidential Information" without providing any factual support of the actual alleged improper act committed by Kravitz. (Compl. ¶ 23.) PhoneDog has not alleged any supporting facts because it cannot, no supporting facts exist.

When a plaintiff alleges fraud (i.e. an intentional tort which would include trade secret misappropriation), a heightened pleading standard is applied and the plaintiff "must aver with particularity the circumstances constituting the fraud." FRCP 9(b). The heightened standard is designed to provide defendants with notice of the "particular misconduct which is alleged to constitute the fraud so they can defendant against the charge and not just deny that they have done anything wrong." *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993). To provide defendants with the requisite "notice", "the complaint must specify such facts as the times, dates, place, and benefits received, and other details of the fraudulent activity." *Id.* at 672.

Here, PhoneDog failed to plead misappropriation with the requisite particularity. PhoneDog does not allege any facts to establish that Kravitz engaged in any improper acts to obtain the alleged secrets. The Complaint does not make any factual allegations regarding Kravitz engaging in theft, bribery, misrepresentation, breach or inducement of a breach of a

duty to maintain secrecy, or espionage.  Rather, PhoneDog makes the conclusory statement that Kravitz used "improper means" to obtain and misappropriate the Twitter password. Kravitz therefore has no notice of the particular conduct in which PhoneDog claims to constitute misappropriation.  As such, PhoneDog's First Claim for Relief does not survive a Rule 12(b)(6) motion to dismiss.

### 3.  PhoneDog's Second Claim For Relief – Intentional Interference With Prospective Economic Advantage

PhoneDog's claim of intentional interference with prospective economic advantage must be dismissed.  "The tort of intentional or negligent interference with prospective economic advantage imposes liability for improper methods of disrupting or diverting the business relationship of another which fall outside the boundaries of fair competition." *Settimo Associates v. Environ Systems, Inc.*, 14 Cal.App.4th 942, 845 (1993) (internal citations omitted).  The elements of intentional interference with a prospective economic advantage are: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1153 (2003).

An essential element is an existing economic relationship.  *Roth v. Rhodes*, 25 Cal.App.4th 530, 546 (1994).  Further, "it must be reasonably probable that the prospective economic advantage would have been realized but for defendant's interference." *Youst v. Longo*, 43 Cal.3d 64, 71 (1987).  A plaintiff must establish an <u>existing economic relationship or a protected expectancy</u> with a third person, not merely a hope of future transactions. *See e.g. Blank v. Kirwan*, 39 Cal.3d 311, 330-31 (1985); *Janda v. Madera Cmty. Hosp.*, 16 F. Supp.2d 1181 (E.D. Cal. 1998).  A plaintiff must also prove that the defendant's conduct was

1    "wrongful by some legal measure other than the fact of interference itself." *Della Penna v.*

2    *Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 393 (1995).

3          Here, PhoneDog insufficiently alleges the existence of an economic relationship

4    between PhoneDog and the Account followers. PhoneDog did not allege that there was an

5    <u>actual</u> economic relationship with any Twitter followers. PhoneDog did not allege that an

6    economic benefit would have probably resulted had Kravitz not disrupted that relationship.

7    Additionally, PhoneDog did not sufficiently allege any intentional acts of Kravitz that actually

8    disrupted an economic relationship. Instead, PhoneDog merely alleges in a conclusory fashion

9    that Kravitz disrupted "PhoneDog's economic relationship with its existing and prospective

10   users" by his aforementioned conduct. (Compl. ¶ 29.). PhoneDog's conclusory allegations

11   need not be accepted as true. *See e.g. Pareto*, 139 F.3d at 699. PhoneDog's Complaint does

12   not provide sufficient factual allegations to survive a motion to dismiss this claim.

13

14              **4.     PhoneDog's Third Claim For Relief – Negligent Interference With
                         Prospective Economic Advantage**

15          Similarly, PhoneDog's claim of negligent interference with prospective economic

16   advantage must be dismissed. The elements of negligent interference with prospective

17   economic advantage are: "(1) an economic relationship existed between the plaintiff and a

18   third party which contained a reasonably probable future economic benefit or advantage to

19   plaintiff; (2) the defendant knew of the existence of the relationship and was aware or should

20   have been aware that if it did not act with due care its actions would interfere with this

21   relationship and cause plaintiff to lose in who or in part the probable future economic benefit

22   or advantage of the relationship; (3) the defendant was negligent; and (4) such negligence

23   caused damage to plaintiff in that the relationship was actually interfered with or disrupted and

24   plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from

25   the relationship." *North American Chemical Co. v. Sup. Court*, 59 Cal.App.4th 764, 786

26   (1997).

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Complaint herein insufficiently alleges (1) the existence of an economic relationship that would have probably resulted in an economic benefit and (2) a negligent act by Kravitz that actually disrupted that relationship. Moreover, "[t]he tort of negligent interference with economic relationship arises only when the defendant owes the plaintiff a duty of care." *LiMandri v. Judkins*, 52 Cal.App.4th 326, 348 (1997). PhoneDog, however, does not allege anywhere in the Complaint that Kravitz owes it a "duty of care" to trigger this claim. Accordingly, PhoneDog's Third Claim for Relief must be dismissed.

**5.    PhoneDog's Fourth Claim For Relief – Conversion**

PhoneDog's claim of conversion must also be dismissed because PhoneDog did not sufficiently allege that it owns or has the right to immediately possess the Account. "Conversion is the wrongful exercise of dominion over the property of another. The elements conversion are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." *Burlesci v. Petersen*, 68 Cal.App.4th 1062, 1066 (1998) (internal citations omitted). Here, PhoneDog's allegation that "was and still is, the owner of the Account and was, and still is, entitled to the possession of the Account" is conclusory and unsupported. (Compl. ¶ 38.) PhoneDog does not assert sufficient facts to support its allegation that the Account and all of the Account's followers are its property or that it has an immediate right to possession of the Account. In fact, as outlined above, Twitter retains all right, title, and interest in all Twitter accounts, which remain the "exclusive property" of Twitter and its licensor. Further, the Account followers are human beings, not property that can be owned or possessed. A plaintiff cannot maintain an action for conversion if he or she "neither has title to the property alleged to have been converted, nor possession thereof". *Moore v. Regents of the University of California*, 51 Cal.3d 120, 136 (1990) (internal citation omitted).

Additionally, the act of conversion "must be knowingly or intentionally done, but a wrongful intent is not necessary." *Taylor v. Forte Hotels International*, 235 Cal.App.3d 1119 (1991). PhoneDog, however, does not allege anywhere in its Complaint that Kravitz's act of

1    conversion was done "knowingly" or "intentionally". Moreover, "there can be no conversion

2    where an owner either expressly or impliedly assents to or ratifies the taking, use or disposition

3    of his property." *Farrington v. A. Teichert & Son, Inc.*, 59 Cal.App.2d 468, 474 (1943). Here,

4    PhoneDog not only informed Kravitz he could continue to use the Account, it informally

5    assented to Kravitz's continued use of the Account by occasionally sending him requests to

6    tweet on its behalf on the Account months after he had separated from his employment. (See

7    Kravitz Decl. ¶¶ 8, 10-12)

8           For these reasons, PhoneDog's Fourth Claim for Relief should be dismissed for failure

9    to state a claim.

10   ## VI.    CONCLUSION

11          For the foregoing reasons, Defendant Kravitz respectfully requests an order from this

12   Court dismissing Plaintiff PhoneDog's Complaint for lack of subject matter jurisdiction

13   pursuant to FRCP 12(b)(1) and 28 U.S.C. §1332(a) and for failure to state a claim upon which

14   relief can be granted pursuant to FRCP 12(b)(6).

15

16   Dated: August 4, 2011                          KLETTER LAW FIRM

17

18

19                                                  By:_____
                                                         Cary Kletter
20                                                       Attorney for Defendant,
                                                         NOAH KRAVITZ
21

22

23

24

25

26

27

28