1    JOHN C. KIRKE, #175055
     SOPHIA E.C. SCHWARTZ, #272915
2    DONAHUE GALLAGHER WOODS LLP
     Attorneys at Law
3    1999 Harrison Street, 25th Floor
     Oakland, California  94612-3520
4    P.O. Box 12979
     Oakland, California  94604-2979
5    Telephone:     (510) 451-0544
     Facsimile:     (510) 832-1486
6

7    Attorneys for Plaintiff
     PHONEDOG, LLC

8

9                  UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11

12    PHONEDOG, LLC, a Delaware
     corporation,

                CASE NO.  3:11-cv-03474-MEJ

13             Plaintiff,

**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF; MISAPPROPRIATION OF TRADE SECRETS; INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; AND CONVERSION**

14        v.

15    NOAH KRAVITZ, an individual,

16            Defendant.

17

18                      **[JURY TRIAL DEMANDED]**

19

20

21

22

23

24

25

26

27

28

Plaintiff PHONEDOG, LLC, ("PhoneDog") alleges as follows:

### JURISDICTION

1.    Plaintiff PhoneDog, LLC is a Delaware Corporation with its principal place of business in Mount Pleasant, South Carolina.

2.    Defendant Noah Kravitz ("Defendant") is a citizen of California residing in this judicial district.

3.    This court has original jurisdiction under 28 U.S.C. § 1332(a), in that it is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of costs and interest, $75,000.

### VENUE

4.    Venue is proper in this district by virtue of 28 U.S.C. § 1391(a).

### THE PARTIES

5.    Plaintiff PhoneDog is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of South Carolina.

6.    Defendant is and at all times relevant, was a citizen of California residing in Alameda County, California.

### FACTUAL ALLEGATIONS

7.    PhoneDog was created on or around August 1, 2001.

8.    PhoneDog is, and at all times relevant hereto was, a highly interactive mobile news and reviews web resource.  PhoneDog reviews the latest mobile products and services across all carriers and platforms, and provides users the resources needed to research, compare prices, and shop from those providers that fit their needs.

9.    PhoneDog's website attracts approximately 1.5 million visitors each month. PhoneDog's videos reach an average audience of 3 million viewers per month.

10.    A significant source of PhoneDog's income derives from advertisements being sold on its website.  PhoneDog's advertisers pay for ad inventory on PhoneDog's website for every 1000 pageviews generated from users visiting PhoneDog's website.

11.    Phone Dog uses a variety of social media, including Twitter, Facebook, and

-1-

YouTube to generate pageviews on its website, as well as to market and promote its services.

12. In order to generate pageviews on its website, PhoneDog requests that its agents and employees maintain Twitter accounts to use in the scope of the services they perform for PhoneDog. PhoneDog's agents and employees tweet links directing followers of PhoneDog's various Twitter accounts to PhoneDog's website, which in turn drives traffic to PhoneDog's website and generates advertising revenue for PhoneDog.

13. There are many details of PhoneDog's relationships with its advertisers as well as its Twitter followers, and users of its website that are not generally known or readily accessible to the public or PhoneDog's competitors. PhoneDog derives independent economic value from this information, which it has developed through many years of substantial time, effort, expense, research, and communication with its users.

14. PhoneDog has taken and continues to take reasonable efforts to maintain the secrecy of this proprietary information, including restricting access to, and distribution of, this confidential information only to agents of PhoneDog who need this information to perform services for PhoneDog.

15. This confidential information includes, but is not limited to, the following: the passwords to PhoneDog's Twitter accounts, including all @PhoneDog_NAME Twitter accounts used by PhoneDog's agents (collectively, the "Confidential Information").

16. The Confidential Information is not generally known or readily accessible, and is maintained in confidence by PhoneDog, with limited access provided to agents of PhoneDog on a need to know basis. PhoneDog has at all times taken reasonable steps to protect such Confidential Information from being stolen or misused. The Confidential Information would be of substantial value to PhoneDog's competitors if it became known to them.

17. PhoneDog hired Defendant as a product reviewer and video blogger beginning on or around April 13, 2006. As part of Defendant's work for PhoneDog, Defendant submitted written and video content to PhoneDog, which was then transmitted to PhoneDog's users via a variety of mediums including but not limited to, PhoneDog's website and PhoneDog's @PhoneDog_Noah Twitter account.

18.     As an agent of PhoneDog, Defendant was given use of and maintained the Twitter account "@PhoneDog_Noah" (the "Account").   Defendant accessed the Account using PhoneDog's Confidential Information, and used the Account to disseminate information and promote PhoneDog's services on behalf of PhoneDog.

19.     During the course of Defendant's work for PhoneDog, the Account generated approximately 17,000 Twitter followers ("PhoneDog Followers").   According to industry standards, each Twitter follower is currently valued at approximately $2.50 per month.   Given the Account's approximately 17,000 followers (PhoneDog Followers), on or about October 2010, the Account had a value of approximately $42,500 per month.

20.     Defendant suddenly resigned his position with PhoneDog in October 2010. Following Defendant's resignation, PhoneDog requested that Defendant relinquish use of the Account.   Instead of relinquishing actual use of the Account, Defendant merely changed the Twitter handle on the Account to "@noahkravitz".   Defendant continues to use the Account, under the handle @noahkravtiz.

21.     On information and belief, between October 2010 and December 2010, Defendant free-lanced for a variety of media outlets before obtaining a full-time position with TechnoBuffalo.  TechnoBuffalo offers services that compete with those of PhoneDog.

22.     On information and belief, subsequent to resigning his position with PhoneDog, Defendant used PhoneDog's Confidential Information to access the Account.  Defendant has used and continues to use the Account, by way of the handle @noahkravitz, to communicate with PhoneDog's Followers without PhoneDog's permission.   Defendant's use of the Account and communication with PhoneDog's Followers is and was done in an attempt to market and advertise his services and the services of his employer.

23.     On information and belief, Defendant has and is attempting to discredit PhoneDog and destroy the confidence that PhoneDog's users have in PhoneDog by and through Defendant's use of the Account, disparaging PhoneDog.

24.     During the time Defendant was performing work for PhoneDog, PhoneDog had economic relationships with entities such as CNBC and Fox News.  Those economic relationships

-3-

1    enabled Defendant, acting on behalf of PhoneDog, to become a contributor on "Street Signs"

2    (CNBC) and "Fox Business Live."   Following Defendant's resignation from PhoneDog,

3    Defendant continued to contribute to "Street Signs" and "Fox Business Live" in order to market

4    and advertise his services and the services of his employer, TechnoBuffalo.

5                                        **CLAIMS FOR RELIEF**

6                                        **FIRST CLAIM FOR RELIEF**

7                                        **(Misappropriation of Trade Secrets)**

8         25.    PhoneDog refers to and incorporates paragraphs 1 through 24 above, as though

9    fully set forth herein.

10        26.    At all times relevant the Confidential Information constituted PhoneDog's trade

11   secrets.

12        27.    PhoneDog is informed and believes, and on that basis alleges, that within the last

13   eight months, Defendant willfully and intentionally used his position with PhoneDog, and trust,

14   authority, and access afford to Defendant by PhoneDog, along with other improper means, as

15   such are defined in Civil Code § 3426.1(a), to obtain and misappropriate the Confidential

16   Information with the intent and desire to further his career, to use and profit from such

17   information, to call on and solicit the very same users of PhoneDog's services, and to harm the

18   relationship that PhoneDog enjoys with its users and advertisers and thus injure PhoneDog.  On

19   information and belief, at all relevant times, PhoneDog knew or had reason to know that the

20   Confidential Information constituted PhoneDog trade secrets.

21        28.    Among other matters, PhoneDog is informed and believes and thereon alleges that

22   Defendant has:

23            (a)    Used Defendant's knowledge of the Confidential information to access the

24   Account and communicate with PhoneDog's Followers, all in an attempt to position Defendant

25   favorably against PhoneDog and convert PhoneDog's users to Defendant's own use;

26            (b)    Made improper use of Defendant's knowledge of the Confidential

27   Information to access the Account to compete unfairly against PhoneDog for PhoneDog's existing

28   customers;

(c) Devised Defendant's marketing of his and his employers' services based on Defendant's knowledge of the Confidential Information; and

(d) Avoided the expenditure of time and resources on locating or obtaining potential users by making use of the Confidential Information to access the Account and communicate with PhoneDog's Followers.

29. As a proximate result of Defendant's trade secret misappropriation, PhoneDog has suffered damages to its business, reputation, and goodwill, including lost advertising revenue and lost users and user opportunities in excess of the minimum jurisdiction of this Court. As a further proximate result of Defendant's trade secret misappropriation, Defendant was unjustly enriched by obtaining the business of PhoneDog's Followers.

30. PhoneDog is informed and believes and thereon alleges, that the aforementioned acts by Defendant were willful and oppressive, or fraudulent, or malicious. PhoneDog is therefore entitled to punitive damages and its reasonable attorneys' fees and costs.

31. Unless and until enjoined by order of this Court, Defendant will continue his illegal efforts and scheme to exploit the Confidential Information. PhoneDog has no adequate remedy at law for the irreparable injuries Defendant has caused and continues to cause, including, but not limited to, damage to PhoneDog's Confidential Information, business, reputation, and goodwill. The continued misappropriation by Defendant of the Confidential Information would require PhoneDog to maintain a multiplicity of judicial proceedings to protect its interests.

WHEREFORE, PhoneDog prays for judgment as set forth below.

## SECOND CLAIM FOR RELIEF

### (Intentional Interference With Prospective Economic Advantage)

32. PhoneDog refers to and herein incorporates paragraphs 1 through 31 above, as though fully set forth herein.

33. PhoneDog has had and continues to enjoy relationships with PhoneDog Followers and prospective users of the Account, and existing and prospective advertisers who pay for ad inventory on PhoneDog's website per 1000 pageviews. Defendant, as a former agent of PhoneDog, has extensive knowledge of those relationships. Defendant knows the history of

-5-

PhoneDog's relationships with the PhoneDog Followers and PhoneDog's advertisers in detail, including which of those relationships contain the probability of future economic benefit to PhoneDog, when, and on what terms, by reasons of PhoneDog's ongoing marketing of its services to the PhoneDog Followers and advertisers.

34.     PhoneDog enjoyed economic relationships with CNBC and Fox News.  Those economic relationships enabled Defendant, on behalf of PhoneDog, to contribute to "Street Signs" (CNBC) and "Fox News Live" (FoxNews).  By having its agents, such as Defendant, contribute to "Street Signs" and "Fox News Live," PhoneDog was able to promote and market its services, as well as drive traffic to its website, which in turn generated advertising revenue for PhoneDog.  As a contributor to  "Street Signs" and "Fox News Live" on PhoneDog's behalf, Defendant was aware of PhoneDog's economic relationships with CNBC and Fox News.

35.     Defendant engaged in wrongful conduct by misappropriating and using PhoneDog's Confidential Information to access the Account despite PhoneDog's request that Defendant relinquish the Account, attempting to wrongly discredit PhoneDog in the eyes of the PhoneDog Followers by and through his use of the Account, attempting to destroy PhoneDog's customers' confidence in PhoneDog by disparaging PhoneDog by and through his use of the Account, and after ceasing to perform services for PhoneDog, using PhoneDog's economic relationships with CNBC and Fox News to continue contributing to "Street Signs" and "Fox News Live" in order to promote himself and TechnoBuffalo.

36.     Defendant's aforementioned wrongful conduct was designed to disrupt, and has in fact disrupted, as well as adversely affected, PhoneDog's economic relationships with the PhoneDog followers and prospective users of the Account, and PhoneDog's existing and prospective advertisers who buy ad inventory on PhoneDog's website in that, as a result of Defendant's conduct, there is decreased traffic to Defendant's website through the Account, which in turn decreases the number of website pageviews and discourages advertisers from paying for ad inventory on PhoneDog's website.  Moreover, as a result of Defendant's wrongful conduct, PhoneDog no longer has contributing spots on "Street Signs" and "Fox News Live."

37.     Defendant engaged in the wrongful conduct described above in an attempt to

market and advertise his services and the services of his employer all at the expense of PhoneDog. Said conduct accordingly constitutes interference with PhoneDog's prospective economic advantage.

38.     As a direct and proximate result of Defendant's wrongful acts, PhoneDog has suffered damage to its business by way of lost advertising revenue, as well as its reputation and goodwill in excess of the minimum jurisdiction of this Court.

39.     Defendant's aforementioned conduct was willful and oppressive, or fraudulent, or malicious. PhoneDog is therefore entitled to punitive damages.

40.     Unless and until enjoined by order of this Court, Defendant will continue his illegal efforts and scheme to interfere with PhoneDog's prospective economic advantage and cause damage to its reputation and goodwill. PhoneDog has no adequate remedy at law for the irreparable injuries Defendant has caused and continues to cause, including, but not limited to, damage to PhoneDog's prospective economic advantage, business, reputation, and goodwill. The continued interference by Defendant with PhoneDog's prospective economic advantage would require PhoneDog to maintain a multiplicity of judicial proceedings to protect its interests.

WHEREFORE, PhoneDog prays for judgment as set forth below.

### THIRD CLAIM FOR RELIEF

### (Negligent Interference with Prospective Economic Advantage)

41.     PhoneDog refers to and incorporates paragraphs 1 through 40 above, as though fully set forth herein.

42.     Defendant owed a duty of care to PhoneDog as an agent of PhoneDog.

43.     As a former agent of PhoneDog Defendant has extensive knowledge of the relationships PhoneDog has with the PhoneDog Followers and prospective users of the Account, and PhoneDog's existing and prospective advertisers who pay for ad inventory on PhoneDog's website based on the number of hits to the website.

44.     Because of Defendant's relationship with PhoneDog, Defendant knew or had reason to believe that the aforementioned wrongful conduct engaged in by Defendant would affect and irreparably harm PhoneDog's economic relationships with the PhoneDog Followers

1    and prospective users of the Account, and PhoneDog's advertisers, and that such relationships

2    contained a probability of future economic benefit.

3        45.    Defendant failed to act with reasonable care by wrongfully interfering with

4    PhoneDog's prospective economic relationships and Defendant's wrongful acts have in fact

5    disrupted PhoneDog's economic relationships with the PhoneDog Followers and prospective

6    users of the Account, and PhoneDog's existing and prospective advertisers, as described above.

7        46.    As a direct and proximate result of Defendant's above-described wrongful acts,

8    PhoneDog has suffered damage to its business by way of lost advertising revenue, as well as its

9    reputation and goodwill in excess of the minimum jurisdiction of this Court.

10       WHEREFORE, PhoneDog prays for judgment as set forth below.

11                          **FOURTH CLAIM FOR RELIEF**

12                                  **(Conversion)**

13       47.    PhoneDog refers to and incorporates paragraphs 1 through 46 above, as though

14    fully set forth herein.

15       48.    At all times herein mentioned, PhoneDog was and still is, the owner of the

16    Account and was, and still is, entitled to the possession of the Account.  The Account and all

17    approximately 17,000 of PhoneDog's Followers generated by the Account, were and are the sole

18    property of PhoneDog.

19       49.    PhoneDog gave Defendant permission to use the Account while Defendant acted

20    as an agent for PhoneDog.  Once Defendant ceased to work for PhoneDog, Defendant was

21    required to return the Account to PhoneDog.

22       50.    On or about October 15, 2010, upon Defendant's resignation from PhoneDog,

23    PhoneDog requested that Defendant relinquish the Account to PhoneDog.  At that point in time,

24    Defendant wrongfully converted the Account to his own use by changing the handle on the

25    Account to @noahkravtiz.  Defendant has used and continues to use the Account with the handle

26    @noahkravitz to communicate with and market his services and services of his employer to

27    PhoneDog's Followers.

28       51.    According to industry standards, each Twitter follower is currently valued at

-8-

approximately $2.50 per month.    Given the Account's approximately 17,000 followers (PhoneDog's Followers), on or about October 2010, the Account had had a value of approximately $42,500 per month.

52.    Between the time of Defendant's conversion of the Account to his own use, and the filing of this action, PhoneDog has expended time and money in the pursuit of the converted Account, all to PhoneDog's further damage in an amount to be proved at trial.

53.    Defendant's acts alleged above were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages.

WHEREFORE, PhoneDog prays for judgment as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, PhoneDog prays:

1.    For the First Claim for Relief for Trade Secret Misappropriation:

(a)    For an order requiring Defendant to show cause, if he has any, why he should not be enjoined as hereinafter set forth, during the pendency of this action;

(b)    For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining Defendant and all persons acting or claiming to act under, in concert with, or for Defendant, or any of them from:

(i)    Engaging in any solicitation of PhoneDog users;

(ii)    Using, copying, dealing with, disclosing, trading, and otherwise exploiting or misappropriating PhoneDog's Confidential Information in order to, including, but without limitation, communicate with PhoneDog's users and PhoneDog's Followers;

(iii)    Destroying any documents or files of any kind, actively or passively, whether in written or electronic form, that relate in any way to PhoneDog's employment of Defendant, the PhoneDog Confidential Information, and/or PhoneDog's actual or prospective users.

(c)    For a temporary restraining order, a preliminary injunction, and a permanent injunction, all requiring Defendant and all persons acting or claiming to act under, in concert with, or for Defendant, or any of them to return all of PhoneDog's Confidential

-9-

1    Information in their custody, possession, or control to PhoneDog;

2            (d)     For general damages in the amount necessary to prevent the unjust

3    enrichment of Defendant (alternatively, if neither PhoneDog's actual damages or Defendant's

4    unjust enrichment is subject to proof, for reasonable royalties);

5            (e)     For punitive damages;

6            (f)     For reasonable attorneys' fees;

7            (g)     For all costs of suit incurred; and

8            (h)     For such other and further relief as the court may deem proper.

9        2.      For the Second Claim for Relief for Intentional Interference with Prospective

10   Economic Advantage:

11           (a)     For an order requiring Defendant to show cause, if he has any, why he

12   should not be enjoined as hereinafter set forth, during the pendency of this action;

13           (b)     For a temporary restraining order, a preliminary injunction, and a

14   permanent injunction, all enjoining Defendant and all persons acting or claiming to act under, in

15   concert with, or for Defendant, or any of them from:

16               (i)     Using the Account to solicit PhoneDog's users;

17               (ii)     Using, copying, dealing with, disclosing, trading, and otherwise

18   exploiting or misappropriating PhoneDog's Confidential Information to, including, but without

19   limitation, communicate with PhoneDog's users and PhoneDog's Followers;

20               (iii)     Destroying any documents or files of any kind, actively or

21   passively, whether in written or electronic form, that relate in any way to PhoneDog's

22   employment of Defendant, PhoneDog's Confidential Information, and/or PhoneDog's actual or

23   prospective clients.

24           (c)     For a temporary restraining order, a preliminary injunction, and a

25   permanent injunction, all requiring Defendant and all persons acting or claiming to act under, in

26   concert with, or for Defendant, or any of them to return all of PhoneDog's Confidential

27   Information in their custody, possession, or control to PhoneDog;

28           (d)     For general damages;

-10-

1        (e)     For punitive damages;

2        (f)     For all costs of suit incurred; and

3        (g)     For such other and further relief as the court may deem proper.

4    3.     For the Third Claim for Relief for Negligent Interference with Prospective

5 Economic Advantage:

6        (a)     For general damages;

7        (b)     For all costs of suit incurred; and

8        (c)     For such other and further relief as the court may deem proper.

9    4.     For the Fourth Claim for Relief For Conversion:

10        (a)     For the value of the property converted;

11        (b)     For the interest at the legal rate on the foregoing sum pursuant to Section

12 336 of the Civil Code, from and after October 15, 2010;

13        (c)     For damages for the proximate and foreseeable loss resulting from

14 defendant's conversion in the sum of $340,000 (17,000 twitter followers, each worth

15 $2.50/month, for 8 months);

16        (d)     For interest at the legal rate on the foregoing sum pursuant to Section

17 3287(a) of the Civil Code, from and after October 15, 2010;

18        (e)     For damages for time and money properly expended in pursuit of the

19 converted property in an amount to be proved at trial;

20        (f)     For punitive and exemplary damages;

21        (g)     For costs of suit herein incurred; and

22        (h)     For such other and further relief as the court may deem proper.

23 Dated: November 29, 2011        DONAHUE GALLAGHER WOODS LLP

25 By: _____

26 John C. Kirke
Attorneys for Plaintiff
PHONEDOG, LLC

1

## DEMAND FOR JURY TRIAL

2        Pursuant to Federal Rule of Civil Procedure 38 and local rule 38-201, Plaintiff hereby

3    demands trial by jury.

4    Dated: November 2?, 2011             DONAHUE GALLAGHER WOODS LLP

5

6                                        By: _____

7                                            John C. Kirke
                                             Attorneys for Plaintiff
8                                            PHONEDOG, LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-12-